**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNION OF CONCERNED SCIENTISTS; and ELIZABETH ANNE SHEPPARD, <br><br> Plaintiffs, <br><br> v. <br><br> E. SCOTT PRUITT, in his official capacity as Administrator of the Environmental Protection Agency; and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Defendants. | Civil Action No. **18-10129_____** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1.      Science conducted by independent, unbiased scientists plays a critical role in a functioning democracy.  It helps lawmakers identify policy priorities.  It informs government agencies' actual adoption and implementation of policy.  Perhaps most importantly, it provides evidence against which government action can be measured, and that the public can use to assess whether our leaders are doing their jobs.  Anti-democratic governments, which thrive on obfuscating truth, seek to delegitimize and suppress scientists and other authoritative voices that offer accurate information that can be used to hold the government to account.

2.      For decades, the U.S. Environmental Protection Agency ("EPA") has relied on balanced, independent advice from eminent scientists and experts.  These individuals are leaders in their fields and are frequently affiliated with preeminent universities and not-for-profit research institutions.  They have counseled the EPA on scientific and policy matters through their service on a variety of EPA federal advisory committees ("FACs" or "advisory committees"), including

the Science Advisory Board, the Board of Scientific Counsellors, and the Clean Air Scientific Advisory Committee, among others.  Because the FACs help shape EPA policy, the EPA has historically worked scrupulously to ensure that they are fairly balanced, impervious to inappropriate influences, and focused on evaluating and presenting the best-available science so that the agency can make informed decisions about science policy.

3.     This Complaint arises from a recent purge of eminent scientists from the EPA's advisory committees resulting from a Directive issued by Administrator E. Scott Pruitt.  The Directive, which is further explained in an EPA Memorandum, prohibits scientists and experts who are recipients of EPA grants from serving on FACs, exempting employees of state, local, and tribal governments.  *See* E. Scott Pruitt, *Strengthening and Improving Membership on EPA Federal Advisory Committees* (Oct. 31, 2017), attached hereto as Exhibit A.[1]  The effect of the ban, which has no precedent and no counterpart at any other federal agency or department, is to single out academic scientists and experts by excluding them from serving EPA in the public interest.

4.     Although the Administrator's stated goal was to strengthen the "independence" of FAC members, the Directive does no such thing.  The Memorandum explaining the Directive cites no evidence that the receipt of EPA grants causes any actual or potential conflict of interest.  Indeed, no such evidence exists.  As the U.S. Court of Appeals for the Fifth Circuit has concluded, "Working for or receiving a grant from [an agency], or co-authoring a paper with a person affiliated with the department, does not impair a scientist's ability to provide technical, scientific peer review of a study sponsored by . . . one of its agencies."  *Cargill, Inc. v. United States*, 173 F.3d 323, 339 (5th Cir. 1999).  To the contrary, if an agency "were required to exclude from peer

---

[1] The EPA has issued two documents pertaining to the Directive: the Directive itself and a Memorandum setting forth the purported rationale for the Directive.  Both are included in Exhibit A.

review committees all scientists who somehow had been affiliated with the department, it would have to eliminate many of those most qualified to give advice." *Id.* The U.S. Department of Justice ("DOJ") has reached—and advocated for—the same conclusion. For example, DOJ recently argued that the fact that EPA has awarded grants to FAC members "does not establish that those members lack independence." Department of Justice, Memorandum of Points and Authorities In Support of Defendant's Motion to Dismiss at 34, *Energy & Envt'l Legal Inst. v. U.S. EPA*, Civ. Ac. No. 16-0915 (TSC) (D.D.C. July 15, 2016), ECF No. 11-1.

5.     The Administrator's Memorandum, moreover, wholly fails to explain why scientists and experts who receive similar grant funding from other sources—for example, scientists affiliated with private industry and local government—fall outside the Directive's scope. Indeed, by effectively singling out academic members of the scientific community who are receiving EPA grants, and by making no effort to exclude others who stand to benefit far more significantly from agency action (or inaction), the Directive lays bare its real function: to stack the deck against scientific integrity.

6.     The EPA has already used the Directive to begin reshaping the EPA's advisory committees in a meaningful way by replacing impartial, well-qualified scientists affiliated with academic and not-for-profit institutions. The effect is that private industry views will be over-weighted and the affected FACs will no longer be fairly balanced in terms of the points of view represented.

7.     The Directive is impeding the EPA's FACs from providing the valuable scientific and policy advice to the federal government for which they were created, all in contravention of EPA's ostensible purpose to constitute these committees with "qualified and knowledgeable candidates." Exhibit A at 3. It has harmed, and will continue to harm, the careers of countless

not-for-profit and university-affiliated scientists and experts who wish to lend their expertise to impact science policy at a national level and serve their country on advisory boards, but are now barred from doing so.

8.      Finally, the Directive is an attack on science itself, as it portrays legitimate, independent scientists—who provide accurate, evidence-based information backed by verifiable, peer-reviewed research in order to inform environmental policy—as just another interest group seeking to advance an agenda.  The open exchange of accurate information is a touchstone of a functioning democracy, and required for ordinary citizens to participate in robust public discourse and hold government leaders accountable.  This unprecedented Directive is an attempt to delegitimize and suppress the role of academic scientists advising the agency and, by extension, the results of their research.

9.      The intent and effect of the ban is to disproportionately discount the viewpoints of academic scientists to the detriment of neutral, evidence-based science.  Accordingly, the Directive is unlawful.

## THE PARTIES

### I.      The Plaintiffs

#### A.  Union Of Concerned Scientists

10.      The Union of Concerned Scientists ("UCS") is a not-for-profit organization with the mission of conducting scientific analysis and research in the public interest, and representing the interests of the scientific community before all levels of the U.S. government.  UCS seeks to ensure that the views of its 540,000 supporters and the broader scientific community, including those of the academic and not-for-profit scientific community, are fairly represented in government and on FACs.  Through the UCS Center for Science and Democracy, UCS works to highlight the

role of impartial, consensus-driven science in solving the nation's most critical problems, and to strengthen the overall partnership between science and democracy.  One of UCS's programs is the UCS Science Network, a membership organization for scientists with or working toward advanced degrees in life, physical, mathematical, or social sciences; professionals with or working towards advanced degrees in medicine or public health; engineers; and people with expertise in science history or science policy.

11.    As an organization that seeks to ensure that the views of the scientific community are represented in government, UCS has a direct interest in ensuring that the advice given to the EPA and the Administrator by FACs fairly reflects the experience and expertise of UCS members and the scientific community as a whole, including the views of academic and not-for-profit scientists.  Since the Directive precipitates the formation of FACs that do not fairly represent academic and not-for-profit scientists, the Directive has inhibited UCS from accomplishing its core mission of advancing and supporting the scientific community's interests in government.  The Directive likewise has ensured that UCS's own views on and analysis of pressing issues—which are informed by the work of academic and not-for-profit scientists—will not be fairly represented on the EPA's FACs.  The Directive thereby has caused injury to UCS.

12.    UCS also seeks to advance the interests of its individual members and the members of the UCS Science Network, many of whom have been injured by the Directive and would benefit from the removal of the Directive.  Numerous UCS members or members of the UCS Science Network are academic scientists who currently hold EPA grants and desire to serve on EPA FACs in the future, but are barred from doing so by the Directive.  Other UCS members or members of the UCS Science Network currently serve on EPA advisory committees and would otherwise apply for or hold EPA grants, but are barred from doing so by the Directive.  All told, approximately

fifteen members of the UCS Science Network were among the latest pool of 132 nominees to the Science Advisory Board ("SAB"); approximately 90 UCS Science Network members are current EPA grant recipients; and approximately 80 UCS Science Network members are currently on EPA advisory committees.  In other words, UCS members and members of the UCS Science Network are directly affected by the Directive.

13.     Staffing EPA's FACs in accordance with law is germane to the purpose of UCS. UCS advocates for evidence-based scientific research to inform government decisions, and that mission is advanced by fairly balanced and qualified EPA FACs.  Fairly balanced FACs that include leading voices from *all areas* of the scientific community strengthen the relationship between science and the federal government that UCS seeks to build.

14.     Neither the claims asserted nor the relief requested in this Action requires that UCS's individual members or members of the UCS Science Network participate directly.  This Action concerns the validity of an agency-wide Directive affecting numerous UCS members, each in substantially the same way, and seeks relief that will remediate their injuries on a collective basis.

### B.  Dr. Sheppard

15.     Dr. Elizabeth Anne ("Lianne") Sheppard is Professor and Assistant Chair of Environmental and Occupational Health Sciences and Professor of Biostatistics at the University of Washington.  Her expertise includes observational study methods, the health effects of air pollution, exposure modeling, and measurement error in health effects studies.  She currently serves as one of the seven members of the EPA Clean Air Scientific Advisory Committee ("CASAC") as a special government employee.  She is eligible to be reappointed to an additional three-year term on the CASAC when her current term concludes.

16.     Before the Directive was issued, Dr. Sheppard served on the CASAC and simultaneously held an EPA grant.  As a result of the Directive, she was forced to give up her role as Co-Investigator on an EPA grant awarding approximately $3 million for research on health effects of air pollution.  Dr. Sheppard has not sought EPA grant funding for any future research.

17.     If the Directive were rescinded, it is likely that Dr. Sheppard could reassume her role as Co-Investigator on the EPA grant that she gave up.

18.     Dr. Sheppard would like to be considered for EPA research grant funding in the future *and* to continue serving on the CASAC.  She views her participation on an EPA FAC as an important form of public service.

## II.     The Defendants

19.     The U.S. Environmental Protection Agency ("EPA") is the agency of the federal government of the United States tasked with protecting human health and the environment.  The EPA oversees and, through its Administrator, appoints and removes members of FACs on which UCS members have served and wish to serve.

20.     Defendant E. Scott Pruitt is the Administrator of the EPA.  He is sued in his official capacity.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction under 28 U.S.C. § 1331.  The Court has remedial authority pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 2201.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(C) because UCS resides in this District.  Specifically, UCS is headquartered in Cambridge, Massachusetts.

## FACTUAL ALLEGATIONS

### I.     The EPA And Federal Advisory Committees

23.     The Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 § 1 *et seq.*, governs the establishment and operation of FACs across the federal government.

24.     The EPA utilizes almost two dozen FACs consisting of eminent scientists and experts on topics relevant to the EPA's mission.

25.     FACs provide crucial high-level scientific and policy advice that helps guide the EPA's decision-making on a wide range of topics.  For instance, the CASAC, as its charter explains, advises on the Clean Air Act and ambient air quality standards and criteria.  *See* CASAC U.S. EPA Charter (2017), attached hereto as Exhibit B.  The SAB, per its charter, provides advice and recommendations on "[t]he adequacy and scientific basis of any proposed criteria document, standard, limitation, or regulation under the Clean Air Act, the Federal Water Pollution Control Act, the Clean Water Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, the Safe Drinking Water Act, the Comprehensive Environmental Response, Compensation, and Liability Act, or any other authority of the Administrator."  *See* SAB U.S. EPA Charter at 1-2 (2017), attached hereto as Exhibit C.  And the Board of Scientific Counsellors ("BOSC"), according to its charter, provides advice and recommendations on, *inter alia*, the EPA Office of Research and Development's "research programs," "research management practices," "program development, progress, and research program balance."  *See* BOSC U.S. EPA Charter at 1 (2016), attached hereto as Exhibit D.

26.     The EPA's FACs have helped guide the EPA's response to some of today's most pressing problems.  In 2013, for example, the SAB advised the EPA on the preferred model for evaluating the health effects of perchlorate, a chemical that can cause cancer and reproductive

health and hormonal problems. That advice was used by the agency to help create a new standard for perchlorate in water, which is pending.[2] FACs also serve as a valuable check on the EPA's actions. For example, in 2016, the SAB concluded that the EPA did not use the required "best available science" standard when assessing whether natural gas exploration impacted drinking water supplies.[3]

27.     The EPA's FACs do not award grants to scientists. On information and belief, the EPA's FACs have not historically made recommendations to EPA about who should receive grants.

28.     Members of the EPA's FACs are appointed by the Administrator and typically serve terms of a defined length, usually either two or three years. Members normally are reappointed for a second term on their committee as a matter of course. The membership of EPA FACs includes subject-matter experts from varied backgrounds, including from the business and government sectors. Prior to the Directive, EPA FACs were well-balanced, representing the interests of a variety of viewpoints.

29.     Traditionally, the FACs' membership comprises individuals with scientific training and has included numerous scientists affiliated with academic and not-for-profit institutions. Indeed, many FACs supervised by the EPA explicitly call for such representation. For example, the CASAC's charter requires that members "be persons who have demonstrated high levels of competence, knowledge, and expertise in scientific/technical fields relevant to air pollution and air quality issues." Exhibit B at 3. Similarly, the SAB's charter stipulates that members be

---

[2] U.S. EPA, *Perchlorate in Drinking Water*, https://www.epa.gov/dwstandardsregulations/perchlorate-drinking-water (last visited Jan. 22, 2018).

[3] Brady Dennis, *EPA's Science Advisers Challenge Agency Report On the Safety of Fracking*, Wash. Post (Aug. 12, 2016), https://www.washingtonpost.com/news/energy-environment/wp/2016/08/11/epas-science-advisers-challenge-agency-report-on-the-safety-of-fracking/?utm_term=.3f1954a5d93c.

"independent experts in the fields of science, engineering, and economics and other social sciences to provide a range of expertise required to assess the scientific and technical aspects of environmental issues." Exhibit C at 3.

30.    The views of leading independent scientists and experts are necessary and crucial to operation of the EPA's FACs.  FACs cannot provide expert, fairly balanced guidance on, for instance, the proper standards or limits under the Clean Air Act without the input of scientists who have devoted their lives to researching and understanding the effects of particulate matter in the air on human health.  Likewise, FACs cannot provide expert, fairly balanced guidance on scientific criteria and standards under the Toxic Substances Control Act, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), the Federal Water Pollution Control Act, and many more important subjects without scientists who have meaningful scientific experience in fields such as biology, medicine, and toxicology.  While the FACs provide high-level advice to policymakers, their advice is informed by and predicated on scientific expertise that only trained, independent scientists can adequately provide.

31.    Leading scientists aspire to, and do, serve on the EPA's FACs. Prior to the Directive, members included faculty from Harvard University, Stanford University, the Keck School of Medicine at the University of Southern California, and the University of Washington.[4] They included a member of the National Academy of Sciences Institute of Medicine, a Fulbright Scholar, and winners of the Francis Foundation Parker B. Francis Award, the Loveless Foundation Mary Hewitt Loveless Award, the 2017 Presidential Early Career Award for Scientists and Engineers, the CHRP Pediatric Research Award, and the University of Michigan School of Public

---

[4] *See* Sharon B. Jacobs, *Advising the EPA: The Insidious Undoing of Expert Government*, Harv. L. Rev. BLOG (Dec. 6, 2017), https://blog.harvardlawreview.org/advising-the-epa-the-insidious-undoing-of-expert-government/.

Health Excellence in Research Award.[5]  These are all highly-qualified scientists committed to serving the public interest.

32.    In addition to monetary compensation, which the EPA offers to members of some committees (including Dr. Sheppard for her work on the CASAC), service on an EPA advisory committee offers a unique opportunity for scientists to help shape public policy and contribute to the public good.

## II.    The Directive

33.    On October 31, 2017, Administrator Pruitt promulgated a Directive and accompanying Memorandum titled "Strengthening and Improving Membership on EPA Federal Advisory Committees."  Exhibit A at 2-6.  The Directive and Memorandum contain a set of principles and instruction governing the composition of the FACs.  One of those instructions provides as follows:  "[I]t shall be the policy of the Agency that no member of an EPA federal advisory committee currently receive EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant."  Exhibit A at 4.

34.    At a minimum, thousands of scientists affiliated with academic and not-for-profit institutions, who currently are in receipt of EPA grants, are no longer eligible to serve on FACs pursuant to the Directive.  The EPA is administering 8,048 grants to individuals or groups affiliated

---

[5] Robert J. Johnson curriculum vitae, http://www2.clarku.edu/departments/economics/facultyvita/Johnston.pdf; Catherine                          Karr                          curriculum                          vitae, https://www.niehs.nih.gov/research/supported/translational/peph/currentissue/lists/2_17/catharine_karr_m.d._ph.d._r eceives_presidential_early_career_award_for_scientists;          Kari          Nadeau          curriculum          vitae, https://med.stanford.edu/profiles/kari-nadeau?tab=bio;    Ana    V.    Diez    Roux    curriculum    vitae    , http://drexel.edu/dornsife/academics/faculty/Ana%20Diez%20Roux/;    Kiros    T.    Berhane    curriculum    vitae, https://keck.usc.edu/faculty/kiros-t-berhane/.

with public institutions of higher learning, private universities, and not-for-profit organizations.[6]

Substantially all individuals serving as a principal investigator or co-investigator on these grants

are ineligible to serve on EPA FACs—an outcome that is not at all necessary from the

circumstances and one for which the pre-Directive conflict of interest scheme properly accounts.[7]

### A. The Directive Is An Unexplained Departure From Long-Standing EPA Policy and Practice.

35.    The Directive breaks with longstanding EPA policy and practice.  For decades,

scientists in receipt of EPA grants have served without incident on EPA committees.  Indeed,

guidance from EPA grant recipients has proven highly valuable to the EPA precisely because EPA

grant recipients, collectively, are some of the brightest minds and most uniquely qualified scientists

in the United States.

36.    The EPA's Office of the Inspector General ("OIG") has laid out the EPA's policy

of allowing grant-holders to serve on EPA FACs.  In a 2013 report, the OIG stated:  "The EPA

does not consider a prospective or current member's receipt of an agency or other federal research

grant to create the basis for a financial conflict of interest." [8]  The OIG further explained that "[t]his

[policy] is consistent with other federal guidance in this area.  For example, OMB's Final Bulletin

on Peer Review states that . . . 'When an agency awards grants through a competitive process that

includes peer review, the agency's potential to influence the scientist's research is limited.  As

---

[6] U.S. EPA, Grant Awards Database, https://www.epa.gov/dwstandardsregulations/perchlorate-drinking-water https://yosemite.epa.gov/oarm/igms_egf.nsf/recipient2?OpenView (last visited Jan. 22, 2018).

[7] Neither the Directive itself nor the accompanying Memorandum specify how it will be determined whether a FAC member is subject to the Directive and who will make that determination.  Likewise, neither document says anything about what actually constitutes a "substantial benefit" that would render an individual unable to serve on a FAC under the Directive.  The documents do not offer any reasoned explanation for this lack of clarity, or offer any guidance on how it will be resolved.  The ambiguity contrasts with the EPA's longstanding policy on scientific integrity, which commits the EPA to "transparency in its interactions with all members of the public."  U.S. EPA, *Scientific Integrity Policy*, https://www.epa.gov/sites/production/files/2014-02/documents/scientific_integrity_policy_2012.pdf.

[8] Office of the Inspector General, U.S. Environmental Protection Agency, Report No. 13-P-0387 at 9 (Sept. 11, 2013) ("OIG Report"), https://www.epa.gov/sites/production/files/2015-09/documents/20130911-13-p-0387.pdf.

such, when a scientist is awarded a government research grant through an investigator-initiated, peer-reviewed competition, there generally should be no question as to that scientist's ability to offer independent scientific advice to the agency on other projects.'"[9]  The EPA's Peer Review Handbook articulates the same view as the OMB Final Bulletin on Peer Review.[10]

37.     Additionally, prior to the Directive, the EPA already had detailed practices for identifying and addressing conflicts of interest.  For example, whenever an individual is appointed to a FAC as a special government employee (how outside scientists typically are appointed)[11], he or she must fill out the Confidential Financial Disclosure Form for Environmental Protection Agency Special Government Employees, EPA Form 3110-48, attached hereto as Exhibit E.  That disclosure form calls for detailed information regarding a candidate's assets, employment, consulting work, paid expert testimony, and research or project funding.  Exhibit E at 4-9.  With respect to project funding, all prospective and active FAC members serving as special government employees ("SGEs") must report any research grants awarded during the past two years, identify whether the grant was awarded competitively or not, and provide the start and completion dates of the project.  Those grants are reviewed as part of the process for identifying possible ethical conflicts.  Exhibit E at 7.  Additionally, an entire section of the Form 3110-48 addresses FAC candidates' impartiality.  Exhibit E at 10 (asking, for example, "Do you know of any reason that you might be unable to provide impartial advice on the matter to come before the panel/committee/subcommittee or any reason that your impartiality in the matter might be

---

[9] *Id*. at 9-10.

[10] U.S. Environmental Protection Agency, Science and Technology Policy Council Peer Review Handbook at 77 (4th ed. 2015).

[11] *See* CASAC Charter, Exhibit B at 3 ("Members will generally serve as Special Government Employees"); SAB Charter, Exhibit C at 3; BOSC Charter, Exhibit D at 3 ("Most SAB members will serve as Special Government Employees"); BOSC Charter, Exhibit D at 3 (members "will serve as Special Government Employees").

questioned?"). Active FAC members "must also update their forms annually as well as before any particular matter is considered by a given member."[12]  In its 2013 report, the OIG reviewed this protocol and determined that "The EPA has adequate procedures for identifying financial conflicts of interest."[13]

38.    Neither the Directive nor the accompanying Memorandum provide a reasoned explanation for the EPA's change in policy, nor for why the OIG's 2013 conclusions no longer are valid.

39.    The Memorandum's discussion of the shift in policy consists of three sentences: "Non-governmental and non-tribal members in direct receipt of EPA grants while serving on an EPA FAC can create the appearance or reality of potential interference with their ability to independently and objectively serve as a FAC member.  FAC members should be motivated by service and committed to providing informed and independent expertise and judgment.  Ensuring FAC member independence strengthens the integrity, objectivity and reliability of EPA FACs." Exhibit A at 4.

40.    For his part, Administrator Pruitt has relied on the Bible to justify the Directive. He has stated: "Joshua says to the people of Israel: choose this day whom you are going to serve." "This is sort of like the Joshua principle—that as it relates to grants from this agency, you are going to have to choose either service on the committee to provide counsel to us in an independent fashion or chose [sic] the grant."[14]

---

[12] OIG Report at 9; *see also* Exhibit E at 1.

[13] OIG Report at 10.

[14] Dino Grandoni, *The Energy 202: Pruitt Cites Bible In Ending Way EPA Committees Staffed*, Wash. Post (Nov. 1, 2017), https://www.washingtonpost.com/news/powerpost/paloma/the-energy-202/2017/11/01/the-energy-202-pruitt-cites-bible-in-ending-way-epa-committees-staffed/59f8f39c30fb0468e7653f76/.

41.    On information and belief, no other agency or department that uses FACs has adopted a policy analogous to the Directive.

**B. The Directive Singles Out And Targets Academic Scientists.**

42.    For reasons that are not clearly articulated, the Directive excludes "state, tribal or local government agency recipients of EPA grants" from its prohibition on FAC membership. Exhibit A at 4.  In other words, scientists who are affiliated with state, tribal, or local governments and receive EPA grants may continue to serve on EPA FACs, but scientists who are affiliated with academic or not-for-profit institutions and receive EPA grants may not continue to do so.

43.    The Directive also does not include any equivalent instruction covering scientists employed in private industry.  Thus, a scientist employed by a company that is directly affected by the work of an EPA FAC may serve on that FAC consistent with the Directive, but a scientist who receives an EPA grant may not serve on *any* FAC under the Directive, even one that has nothing to do with his or her grant.

44.    The Directive itself has practically no effect on scientists working in the private sector, as such individuals almost never receive EPA grants.  (Presently, just three for-profit organizations are in receipt of EPA grants.)[15]  Accordingly, a natural result of the Directive is that there will be substantially more seats on the EPA's FACs held by private industry representatives with a profit motive to advise the EPA to reach certain conclusions, while substantially fewer seats will be held by academic and not-for-profit scientists.  The Memorandum offers no explanation for Defendant Pruitt's failure to issue an equivalent restriction covering scientists affiliated with private industry.

---

[15] U.S. EPA, Grant Awards Database, https://yosemite.epa.gov/oarm/igms_egf.nsf/recipient2?OpenView (last visited Jan. 22, 2018).

45.     These features of the Directive demonstrate that it singles out academic and not-for-profit scientists.  As past actions of Defendants make clear, this purpose and effect aligns with other actions that have limited the influence of independent academic scientists, and their research, within the EPA and in the federal government generally.  For instance, in June 2017, Administrator Pruitt gave notice to dozens of members of the BOSC that their terms would not be renewed.[16] And in August 2017, the Administration disbanded the Advisory Committee for the Sustained National Climate Assessment, a panel chartered by the National Oceanic and Atmospheric Administration that was working on an important report dealing with climate change.[17]  The Directive is in the same vein as these actions.

46.     The Directive is consistent with broader actions to amplify the influence of regulated industries at the EPA at the expense of the environment and public health.  For instance, in the approximately ten months since Administrator Pruitt took charge of the agency, he has met with environment and public health groups twelve times.  During the same time period, he has met with representatives of regulated industry 218 times.[18]  By bringing about the replacement of academic researchers with representatives of regulated industries, the Directive furthers the EPA's *promotion* of regulatory capture rather than serving as a guard against it.

---

[16] Chris Mooney & Juliet Eilperin, *EPA Just Gave Notice To Dozens of Scientific Advisory Board Members That Their Time Is Up*, Wash. Post (June 20, 2017), https://www.washingtonpost.com/news/energy-environment/wp/2017/06/20/trump-administration-to-decline-to-renew-dozens-of-scientists-for-key-epa-advisory-board/?utm_term=.02fccc71e7c4.

[17] Juliet Eilperin, *The Trump Administration Just Disbanded a Federal Advisory Committee on Climate Change*, Wash. Post (Aug. 20, 2017), https://www.washingtonpost.com/news/energy-environment/wp/2017/08/20/the-trump-administration-just-disbanded-a-federal-advisory-committee-on-climate-change/.

[18] Brandy Dennis & Juliet Eilperin, *How Scott Pruitt Turned the EPA into One of Trump's Most Powerful Tools*, Wash. Post (Dec. 31, 2017), https://www.washingtonpost.com/national/health-science/under-scott-pruitt-a-year-of-tumult-and-transformation-at-epa/2017/12/26/f93d1262-e017-11e7-8679-a9728984779c_story.html?utm_term=.c4a34d213b70.

47.     The result of the Directive is to undermine scientific integrity.  As numerous studies have shown, industry-affiliated scientists are more likely to reach pro-industry conclusions than are their non-industry-affiliated counterparts.  Research has demonstrated, for example, that "the only factor associated with [a review article] concluding that passive smoking is not harmful was whether an author was affiliated with the tobacco industry";[19] that industry-associated trials found a lower probability that dental implants would fail;[20] and that industry-funded spine research demonstrated a statistically greater likelihood of reporting positive results.[21]  Although issued in the name of "integrity, objectivity and reliability," the Directive is having the opposite effect. Exhibit A at 4.

### C.  Separate Federal Laws And Regulations Governing Conflicts Of Interest Permit Grant Holders To Serve On FACs And Conflict With The Directive.

48.     Apart from the Directive, separate federal laws governing ethics and conflicts of interest have long regulated, and continue to regulate, the participation of most scientists on FACs. Federal law sets out a comprehensive scheme for ensuring that government employees are free from conflicts of interest.  This regime applies to all government employees, including both regular government employees ("RGEs") and SGEs.  The vast majority of scientists serving on FACs do so as SGEs or (less commonly) as RGEs, so this regime applies to the vast majority of scientists serving on EPA advisory committees.

---

[19] Deborah E. Barnes & Lisa A. Bero, *Why Review Articles on the Health Effects of Passive Smoking Reach Different Conclusions*, 279 JAMA 1566 (1998), https://www.ncbi.nlm.nih.gov/pubmed/9605902.

[20] Antoine Popelut et al., *Relationship Between Sponsorship and Failure Rate of Dental Implants: A Systematic Approach*, PLoS ONE, Apr. 21, 2010, http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0010274.

[21] Rahul V. Shah, *Industry Support and Correlation To Study Outcome for Papers Published In Spine*, 30 Spine 1099 (2005), https://www.ncbi.nlm.nih.gov/pubmed/15864166.

49.     Before the Directive was issued, the only financial limitations on SGEs' service on EPA FACs were those imposed by uniform federal ethics rules.

50.     18 U.S.C. § 208 is the primary statutory source of conflict-of-interest prohibitions applicable to FACs.  Section 208(a) establishes a broad criminal prohibition on financial conflicts of interest, and § 208(b) establishes exceptions to that prohibition.

51.     18 U.S.C. § 208(d)(2) authorizes the Office of Government Ethics ("OGE") to promulgate "uniform" regulations to implement the provisions of § 208(b).  Such regulations "shall . . . list and describe exemptions" and "provide guidance with respect to the types of interests that are not so substantial as to be deemed likely to affect the integrity of the services the Government may expect from the employee."  18 U.S.C. § 208(d)(2).

52.     Executive Order 12731 further reinforces OGE's authority to promulgate uniform federal ethics rules.  That Executive Order directs OGE to establish ethics regulations for executive branch employees, which constitute "a single, comprehensive, and clear set of executive-branch standards of conduct."  Exec. Order No. 12,731 § 201(a), 55 Fed. Reg. 42, 547 (Oct. 17, 1990).

53.     In 18 U.S.C. § 208, Congress set up a carefully articulated scheme designed to strike a delicate balance between protecting against conflicts of interest and ensuring that talented individuals can continue to serve in government.  Indeed, the statute's legislative history states that the statute seeks to balance the goals of "protecting government integrity" and of enabling agencies to harness the best available "skill, talent, and experience" in hiring part time employees.[22] Likewise, soon after the statute was enacted, the Attorney General promulgated a memorandum that described the statute's purpose as "to help the Government obtain the temporary or intermittent services of persons with special knowledge and skills whose principal employment is

---

[22] S. Rep. No. 87-2213 at 6-7 (1962), as reprinted in 1962 U.S.C.C.A.N. 3852, 3855-56.

outside the Government," and positioned the statute as a departure from prior requirements which were "unnecessarily severe" and "impeded the departments and agencies in the recruitment of experts for important work."[23]

54.     The existing laws and regulations make clear that individuals holding EPA grants *can* serve on FACs without creating a conflict of interest, and the Directive inexplicably contravenes this statutory scheme.

55.     *First*, 18 U.S.C. § 208(a) prohibits an executive branch employee from participating "personally and substantially" in any "particular matter" in which he or she has a "financial interest."  *See* 5 C.F.R. § 2635.402(a).  Regulations promulgated by the Office of Government Ethics have elaborated on this prohibition.

    a.  A "particular matter encompasses only matters that involve deliberation, decision, or action that is focused upon the interests of specific persons, or a discrete and identifiable class of persons."  It "does *not* extend to the consideration or adoption of *broad policy options* that are directed to the interests of a large and diverse group of persons."  5 C.F.R. § 2635.402(b)(3) (emphases added).

    b.  A violation occurs only where the particular matter will have a "direct and predictable" effect on the employee's financial interest.  5 C.F.R. § 2635.402(a).  A direct and predictable effect is one that has "a close causal link" between the decision made and a financial effect, and where there is a "real, as opposed to a speculative possibility that the matter will affect the financial interest."  5 C.F.R. § 2635.402(b)(1).

---

[23] Dep't of Justice, Memorandum Regarding Conflict of Interest Provisions of Public Law 87-849, 28 Fed. Reg. 985 (Feb. 1, 1963).

56.     These provisions typically pose no barrier to an EPA grantee who wishes to serve on a FAC as an employee.  The work of EPA FACs by nature, and by general mandate, is focused on providing high-level scientific and policy advice.  Typically, it does not relate to discrete persons, classes of persons, or particular scientific grants, and generally does not have a "direct or predictable" effect on any particular grant.

57.     *Second*, regulations promulgated by OGE explicitly authorize individuals classified as SGEs to serve on FACs, *notwithstanding most financial conflicts of interest*.  The OGE regulations state that "[a] special [g]overnment employee serving on an advisory committee within the meaning of the Federal Advisory Committee Act . . . may participate in any particular matter of general applicability where the disqualifying financial interest arises from his non-Federal employment . . . provided that the matter will not have a special or distinct effect on the employee other than as part of a class."  5 C.F.R. § 2640.203(g).

58.     The Directive blatantly conflicts with this provision.  Virtually all scientists serving as SGEs on EPA-organized FACs, including Dr. Sheppard and members of UCS, fall into this carve out because EPA-organized FACs almost never take actions that have "special or distinct effect[s]" on committee members.

59.     *Third*, the OGE regulations lay out the situations in which executive branch employees, such as scientists serving as SGEs on FACs, are prohibited from engaging in outside activities.  5 C.F.R. § 2635.802.  Such activities are prohibited *only* when they "conflict with an employee's official duties," which occurs only when: (a) the activity "is prohibited by statute or by an agency's supplemental regulation," or (b) when the activity would give rise to a conflict of interest requiring the employee's disqualification from matters such that the employee's ability to discharge his duties would be materially impaired.  *See* 5 C.F.R. § 2635.802(a)-(b).  Neither of

those situations routinely apply to EPA grant-holders because the EPA has not promulgated any supplemental regulation covering grant holders, *see infra* paragraphs 60-61, and conflicts of interest based on EPA grants requiring recusal are rare, *see supra* paragraph 56.  Accordingly, the Directive has the effect of banning a kind of outside activity for EPA FAC members that the Office of Government Ethics has indicated does not conflict with an employee's official duties.

60.     *Fourth*, the OGE regulations provide a process for an agency to add additional ethics requirements for its employees, which the EPA did not follow in issuing the Directive.  The regulations state that "[a]n agency that wishes to supplement this part shall prepare and submit to the Office of Government Ethics, for its concurrence and joint issuance, any agency regulations that supplement the regulations contained in this part."  5 C.F.R. § 2635.105(a).  They further state that "[a]fter concurrence and co-signature by the Office of Government Ethics, the agency shall submit its supplemental agency regulations to the Federal Register for publication and codification . . . .  Supplemental agency regulations issued under this section are effective only after concurrence and co-signature by the Office of Government Ethics and publication in the Federal Register."  *Id.* § 2635.105(b).  In promulgating this regulation, OGE explained that the "uniformity" required by law "cannot be achieved if agencies can pick and choose which provisions they adopt or override."  Standards of Ethical Conduct for Employees of the Executive Branch, 57 Fed. Reg. 35,006, 35,010 (Aug. 7, 1992).

61.     Neither the Memorandum accompanying the Directive, nor the Directive itself, was co-signed by the Office of Government Ethics or published in the Federal Register.

62.     Neither the Memorandum accompanying the Directive, nor the Directive itself, makes mention of the applicable statutes and regulations or of the Office of Government Ethics.

Neither document provides any explanation whatsoever for the apparent conflict with the rules promulgated by the Office.

### III.   Implementation Of The Directive

63.   Defendants have used the Directive to purge scientists affiliated with academic and not-for-profit institutions from the EPA's FACs.  Numerous scientists have been removed or forced to resign from the EPA's most critical FACs and have been replaced, pursuant to the Directive, with individuals who are associated with state and local governments and private industries directly affected by the work of the EPA.

64.   For example, shortly after the issuance of the Directive, on November 3, 2017, Dr. Robyn Wilson—a member of the SAB and an EPA grant holder—received an email from an EPA employee thanking her for her service and implying that she was to be removed pursuant to the Directive.

65.   Dr. Wilson responded and stated that she would not resign and that Defendants instead should formally terminate her.  The EPA has since promulgated a roster of SAB members that does not include Dr. Wilson.[24]  Additionally, an EPA spokesman, Liz Bowman, has stated to the Washington Post in reference to Dr. Wilson that "The Administrator has issued a directive which clearly states his policy in this regard."[25]

66.   Similarly, on October 23, 2017, about a week before the Directive issued, Plaintiff Dr. Sheppard received an email from an EPA employee, Aaron Yeow, requesting that she inform him if she was the recipient of a current EPA grant.  Mr. Yeow forwarded Dr. Sheppard an email

[24] Brady Dennis & Juliet Eilperin, *'Mr. Pruitt Is Welcome To Officially Fire Me' – As EPA Carries Out Controversial Policy, One Scientist Balks*, Wash. Post (Nov. 10, 2017), https://www.washingtonpost.com/news/energy-environment/wp/2017/11/10/epa-extends-controversial-conflict-of-interest-policy-to-nearly-two-dozen-advisory-boards/?utm_term=.d9e758df519b.

[25] *Id.*

written by another EPA employee that stated: "The EPA Administrator is in the process of making final decisions on SAB and CASAC membership and additional clarification is needed. Membership selection will reflect potential policy changes concerning whether the member or candidate has a current active EPA grant."

67.     On October 24, 2017, Dr. Sheppard replied to Mr. Yeow that she did hold an EPA grant whose funding was set to expire on November 30, 2017 and offered to step off that grant. Mr. Yeow did not respond.

68.     On November 29, 2017, Mr. Yeow wrote to Dr. Sheppard and again asked whether she held a current EPA grant.   Mr. Yeow forwarded an email drafted by an EPA employee that stated: "The EPA Administrator has issued a new directive on federal advisory committee membership . . . .   As a result, membership on current SAB and CASAC panels will reflect this policy change if the member has a current active EPA grant."

69.     On December 1, 2017, Dr. Sheppard replied and stated that she had been offered a new EPA grant, but that she had declined support from that grant.  Dr. Sheppard declined to receive funding from the grant because she wanted to remain a member of CASAC and believed that accepting the grant would render her ineligible under the Directive.

70.     Purges of EPA FAC members have continued since the Directive was issued.  In mid-December 2017, for example, at least four members of Science Advisory Board subcommittees were instructed that they must surrender their seats in order to keep their grant funding.[26]

---

[26] Sean Reilly, *Pruitt Sweeps More Scientists Off Advisory Panels,* E&E News (Dec. 22, 2017), https://www.eenews.net/stories/1060069799.

71.     Before the Directive was issued, scientists serving on EPA FACs typically were reappointed to a second term as a matter of course.  After the Directive was issued and as relevant herein, EPA did not reappoint grantees who had been serving on EPA advisory committees.

72.     The Directive has had and will continue to have a profound effect on the EPA's FACs.  Countless environmental scientists in the United States who are affiliated with academic and not-for-profit institutions hold, at some point will hold, or aspire to hold EPA grants.  Accordingly, the Directive effectively ensures that the academic and not-for-profit scientists who have expertise in matters related to the work of the EPA will not and, indeed, cannot have meaningful representation on the EPA's FACSs.

73.     As Thomas A. Burke, a former science adviser and deputy head of research at the EPA, has explained, the Directive excludes "a subset of the best and brightest minds in environmental science from participation in which should be the highest science advisory role in the country."[27]  Similarly, Ana Diez Roux, a past chairperson of CASAC, has stated:  "The top scientists, the ones most qualified to provide objective and transparent scientific advice to EPA, are of course the scientists who will likely be most successful at obtaining highly competitive grants."  She has further noted that "[i]t would be a disservice to the American public to exclude those most qualified from serving on these panels."[28]

74.     Already, the Directive has resulted in numerous individuals being removed from FACs.  Of those individuals, virtually all are scientists affiliated with academic or not-for-profit institutions.  On information and belief, the EPA is applying the Directive in its selection of new

[27] Juan Carlos Rodriguez, *Pruitt's Grant Ban Stokes Concerns About EPA's Integrity*, Law360 (Nov. 1, 2017), https://www.law360.com/articles/980575/pruitt-s-grant-ban-stokes-concerns-about-epa-s-integrity.

[28] Hannah Northey & Sean Reilly, *Proposal To Ban EPA Grantees from Agency Science Advisory Boards Stirs Controversy*, Science (Oct. 18, 2017), http://www.sciencemag.org/news/2017/10/proposal-ban-epa-grantees-agency-science-advisory-boards-stirs-controversy.

members of its FACs and may also be continuing to remove members of FACs pursuant to the Directive. As a result, there already has been a significant increase in the number of FAC members affiliated with private industry and a decrease in members who are academic or not-for-profit scientists.

75.     For instance, since the Directive issued, two of the seven members of the CASAC have been removed by Defendant Pruitt. Each of the three replacements (including one replacement for a vacant seat) named by Defendant Pruitt in accordance with the Directive is affiliated with a private sector or local or state government entity.[29]

76.     Similarly, Defendant Pruitt has removed at least six members of the SAB whose terms were incomplete, all of whom were affiliated with academic institutions. Approximately six other members were not selected to serve a second term on the SAB. Of the approximately 18 new members selected thus far by Defendant Pruitt pursuant to the Directive, only five are affiliated with academic or not-for-profit institutions and none are currently directly receiving EPA funding. One recent estimate, from The Center for Science and Democracy, estimates that on the SAB alone, the number of academic researchers has been cut nearly by half while the number of committee members affiliated with private sector organizations has tripled.[30]

77.     Because of the Directive, the EPA's FACs will continue to become less balanced as new members are appointed pursuant to the Directive. Scientists affiliated with academic and not-for-profit institutions often are best equipped to help EPA FACs provide advice based on the

---

[29] Sean Reilly & Kevin Bogardus, *EPA Unveils New Industry-Friendlier Science Advisory Boards*, Science (Nov. 3, 2017), http://www.sciencemag.org/news/2017/11/epa-unveils-new-industry-friendlier-science-advisory-boards.

[30] *See* Brady Dennis & Juliet Eilperin, *'Mr. Pruitt Is Welcome To Officially Fire Me' – as EPA Carries Out Controversial Policy, One Scientist Balks*, Wash. Post (Nov. 10, 2017), https://www.washingtonpost.com/news/energy-environment/wp/2017/11/10/epa-extends-controversial-conflict-of-interest-policy-to-nearly-two-dozen-advisory-boards/?utm_term=.f2a12f70f80e.

best available science, but they effectively have been barred from meaningfully participating in the committees. Moreover, the replacement of scientists removed under the Directive with individuals affiliated primarily with private companies means that the views of academic scientists who remain on the committees will be reduced, and the views of private industry will be amplified.

78.   The imbalance created by the Directive has serious consequences for FACs. In addition to providing experience and perspectives that are critical to the operation of FACs, academic and not-for-profit scientists are necessary to balance out the presence and perspectives of individuals affiliated with private industry and local government. As discussed *supra* paragraph 47, there is a substantial body of evidence on "funding-induced bias," which shows that industry-funded studies tend to have conclusions favorable to industry.[31] By effectively prohibiting large numbers of academic scientists from serving on its FACs, the Directive has made it likely that the views and preferences of private industry will be reflected in the work of the EPA's FACs to the

---

[31] Sheldon Krimsky , *Do Financial Conflicts of Interest Bias Research?: An Inquiry into the "Funding Effect" Hypothesis*, 38 Sci., Tech., & Human Values 566 (2013), http://journals.sagepub.com/doi/abs/10.1177/0162243912456271; Maira Bes-Rastrollo et al., *Financial Conflicts of Interest and Reporting Bias Regarding the Association between Sugar-Sweetened Beverages and Weight Gain: A Systematic Review of Systematic Reviews*, PLOS Medicine, Dec. 2013, http://journals.plos.org/plosmedicine/article?id=10.1371/journal.pmed.1001578;
David Krauth et al., *Nonindustry-Sponsored Preclinical Studies on Statins Yield Greater Efficacy Estimates Than Industry-Sponsored Studies: A Meta-Analysis*, PLOS Biology, Jan. 2014, http://journals.plos.org/plosbiology/article?id=10.1371/journal.pbio.1001770; M. Abdel-Sattar et al., *The Relationship Between Risk of Bias Criteria, Research Outcomes, and Study Sponsorship In a Cohort of Preclinical Thiazolidinedione Animal Studies: A Meta-Analysis*, 1 Evid.-based Preclinical Med. 11 (2015), http://onlinelibrary.wiley.com/doi/10.1002/ebm2.5/abstract;jsessionid=893D2956392DB6978B012C83E7540A0E.f 04t03?systemMessage=Wiley+Online+Library+usage+report+download+page+will+be+unavailable+on+Friday+24 th+November+2017+at+21%3A00+EST+%2F+02.00+GMT+%2F+10%3A00+SGT+%28Saturday+25th+Nov+for +SGT+; Rahul V Shah, *Industry Support and Correlation To Study Outcome for Papers Published In Spine*, 30 Spine 1099 (2005), https://www.ncbi.nlm.nih.gov/pubmed/15864166; Antoine Popelut et al., *Relationship Between Sponsorship and Failure Rate of Dental Implants: A Systematic Approach*, PLoS ONE, Apr. 21, 2010, http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0010274; Deborah E. Barnes & Lisa A. Bero, *Why Review Articles on the Health Effects of Passive Smoking Reach Different Conclusions*, 279 JAMA 1566 (1998), https://www.ncbi.nlm.nih.gov/pubmed/9605902; Veronica Yank et al., *Financial Ties and Concordance Between Results and Conclusions In Meta-Analyses: Retrospective Cohort Study*, 335 BMJ 1202 (2007), http://www.bmj.com/content/335/7631/1202.

exclusion of the views and experience of the scientific community.  The resulting FACs will imperil scientific integrity and threaten public health.

79.     Finally, and fundamentally, the Directive is an attempt to delegitimize and suppress the role of academic scientists in advising the agency and, by extension, the results of their research.  This is troubling not just because of the importance of objective science to the EPA's mission, but also because American policymakers, businesses, and the American public must be able to trust that the government's policies are grounded in fact-based analysis.  Government suppression of scientists and scientific research impedes the American public's ability to knowledgably engage with pressing national issues—a core requirement of any functioning democracy.

## CAUSES OF ACTION

### COUNT ONE
### (Administrative Procedure Act/Arbitrary and Capricious)

80.     Plaintiffs reallege the foregoing allegations as if set forth fully herein.

81.     The EPA's Directive is a final agency action.  It is the consummation of the EPA's process on this matter.  The agency has nothing further to do in order to issue direction to agency officials.  Furthermore, rights and obligations have been determined by the Directive and legal consequences flow from it.  The agency has removed and will continue to remove individuals from FACs as a result of the Directive.

82.     Under 5 U.S.C. § 706(2)(A), an agency may not take an action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

83.     The Directive's instruction  that individuals may not serve on an EPA-administered FAC if they are in receipt of or are in a position that "would reap substantial direct benefit" from

27

an EPA grant, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  Exhibit A at 4.

84.     The policy is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because it (a) is not an exercise of reasoned decision-making because it failed to consider reasonable alternatives and failed to articulate a rational connection between the facts found and the choice made; (b) is a *sub silentio* departure from a previously established agency policy without adequate explanation; (c) conflicts with and is unnecessary in light of 18 U.S.C. § 208 and the applicable regulations promulgated by the Office of Government Ethics; and (d) amounts to a clear error in judgment.

## COUNT TWO
### (Administrative Procedure Act/Excess of Statutory Authority)

85.     Plaintiffs reallege the foregoing allegations as if set forth fully herein.

86.     The EPA's Directive is a final agency action.  It is the consummation of the EPA's process on this matter.  The agency has nothing further to do in order to issue direction to agency officials.  Furthermore, rights and obligations have been determined by the Directive and legal consequences flow from it.  The agency has removed and will continue to remove individuals from FACs as a result of the Directive.

87.     Under 5 U.S.C. § 706(2)(C), an agency may not take an action that is "in excess of statutory jurisdiction, authority, or limitations."

88.     FACA delegates authority to the Administrator of the General Services Administration ("GSA") to "prescribe administrative guidelines and management controls applicable to advisory committees."  5 U.S.C. App. 2 § 7(c).

89.     FACA directs each agency head to "establish uniform administrative guidelines and management controls for advisory committees established by that agency" and mandates that such

guidelines and controls "be consistent with directives of the Administrator [of GSA] under section 7 and section 10 [of FACA]."  5 U.S.C. App. 2 § 8(a).

90.     Pursuant to its authority under FACA, the GSA has directed agency heads to "[a]ssure that the interests and affiliations of advisory committee members are reviewed for conformance with applicable conflict of interest statues, regulations issued by the U.S. Office of Government Ethics (OGE) including any supplemental agency requirements, and other Federal ethics rules."  41 C.F.R. § 102-3.105(h).

91.     The EPA Directive exceeds statutory authority because it is not "consistent with directives of the Administrator [of GSA]," as FACA requires.  5 U.S.C. App. 2 § 8(a).  Specifically, it is not consistent with the GSA directive to review FAC eligibility in "conformance with applicable conflict of interest statutes, regulations issued by the U.S. Office of Government Ethics (OGE) including any supplemental agency requirements, and other Federal ethics rules" because it mandates that FAC eligibility be reviewed based on criteria that conflict with those rules and requirements.  41 C.F.R. § 102-3.105(h).

92.     For example, the EPA Directive attempts to override the exemption for SGEs set out in 5 C.F.R. § 2640.203(g) by not allowing EPA grant recipients to participate in the types of matters that the regulation expressly authorizes.  The EPA Directive thus conveys Defendants' refusal to assure that review of FAC candidates will be accomplished in conformance with applicable conflict of interest rules.  Such a refusal is in excess of the authority Congress granted to Defendants in 5 U.S.C. App. 2 § 8(a).

## COUNT THREE
### (Administrative Procedure Act/Federal Advisory Committee Act, 5 U.S.C. § 5(b)(2))

93.     Plaintiffs reallege the foregoing allegations as if set forth fully herein.

94.    The EPA FACs are "federal advisory committees" within the meaning of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 § 1 *et seq*.

95.    FACA provides that FACs should be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. 2 § 5(b)(2).  It additionally states that this requirement "shall be followed by the President, agency heads, or other Federal officials in creating an advisory committee."  5 U.S.C. App. 2 § 5(c).

96.    The Directive's instruction that individuals may not serve on an EPA-administered FAC if they are in receipt of or are in a position that would reap substantial direct benefit from an EPA grant is in violation of FACA, 5 U.S.C. App. 2 § 5(b)(2), because it creates FACs that are not "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. 2 § 5(b)(2).  The Directive creates FACs that are not fairly balanced because it disproportionately excludes scientists affiliated with academic and not-for-profit institutions from service on the EPA's FACs.

97.    EPA FACs presently are not fairly balanced in terms of the points of view represented because, pursuant to the policy, they disproportionately exclude scientists affiliated with academic and not-for-profit institutions.

98.    By promulgating a policy in violation of 5 U.S.C. App. 2 § 5(b)(2), the EPA has taken action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(B)).

99.    There is a "meaningful standard against which to judge" the legality of the Directive under 5 U.S.C. App. 2 § 5(b)(2).  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  By specifying that FACs must be "fairly balanced in terms of the points of view represented," FACA provides a meaningful standard.  *See Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for*

*Foods*, 886 F.2d 419, 422-23 (D.C. Cir. 1989) (Friedman, J., concurring in the judgment); *id.* at

433-34 (Edwards, J., concurring in part and dissenting in part); *Nat'l Anti–Hunger Coal. v. Exec.*

*Comm., President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1074 n.2 (D.C. Cir.

1983).    Specifically, "[t]he appropriate inquiry in determining whether the Committee's

membership satisfies the 'fairly balanced' standard in section 5(b)(2) is whether the Committee's

members 'represent a fair balance of viewpoints given the functions to be performed.'"  *Public*

*Citizen*, 886 F.2d at 423 (Friedman, J., concurring in the judgment (citation omitted)); *see also*

*Colo. Envtl. Coal. v. Wenker*, 353 F.3d 1221, 1232-33 (10th Cir. 2004); *Cargill, Inc. v. United*

*States*, 173 F.3d 323, 335 (5th Cir. 1999); *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*,

26 F.3d 1103, 1106-07 (11th Cir. 1994).

**COUNT FOUR**
**(Administrative Procedure Act/Federal Advisory Committee Act, 5 U.S.C. § 5(b)(3))**

100.    Plaintiffs reallege the foregoing allegations as if set forth fully herein.

101.    The EPA FACs are "federal advisory committees" within the meaning of the

Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 § 1 *et seq*.

102.    FACA provides that FACs must "not be inappropriately influenced by the

appointing authority or by any special interest, but will instead be the result of the advisory

committee's independent judgment."  5 U.S.C. App. 2 § 5(b)(3).  It additionally states that this

requirement "shall be followed by the President, agency heads, or other Federal officials in creating

an advisory committee."  5 U.S.C. App. 2 § 5(c).

103.    The Directive's instruction that individuals may not serve on an EPA-administered

FAC if they are in receipt of or are in a position that would reap substantial direct benefit from an

EPA grant is in violation of FACA, 5 U.S.C. App. 2 § 5(b)(3), because it creates FACs that are

"inappropriately influenced by the appointing authority or by any special interest."

104.    EPA FACs presently are inappropriately influenced by Defendant Pruitt, the "appointing authority," in violation of 5 U.S.C. App. 2 § 5(b)(3), because the Directive promulgated by Defendant Pruitt was established for an improper purpose and is arbitrary, capricious, and an abuse of discretion.

105.    EPA FACs presently are inappropriately influenced by special interests, in violation of 5 U.S.C. App. 2 § 5(b)(3), because they are disproportionately composed of representatives of private sector industry and state and local governments.

106.    By promulgating a policy in violation of 5 U.S.C. App. 2 § 5(b)(3), the EPA has taken action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(B)

107.    There is a meaningful standard against which to judge the legality of the Directive under 5 U.S.C. App. 2 § 5(b)(3).  *See Heckler*, 470 U.S. at 830.  Much like Section 5(b)(2) of FACA, Section 5(b)(3) includes a meaningful standard by specifying that a FAC must not be "inappropriately influenced by the appointing authority or by any special interest."  *See Public Citizen*, 886 F.2d at 425-26 (Friedman, J., concurring in the judgment) (reaching merits of claim under § 5(b)(3)); *see also Cargill*, 173 F.3d at 338-39 (reaching merits of a claim under § 5(b)(3)).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.    Declare that the EPA's policy of removing and refusing to appoint to FACs individuals in receipt of an EPA grant or who "would reap substantial direct benefit" from an EPA grant is arbitrary, capricious, an abuse of discretion, and otherwise in violation of law.

B.    Enjoin the EPA and its employees, officers, and agents from implementing the policy of removing from FACs, and refusing to consider for positions on FACs, individuals in receipt of an EPA grant or who "would reap substantial direct benefit" from an EPA grant.

C.    Award Plaintiffs their reasonable attorney's fees and costs.

D.    Award any other relief the Court deems just and proper

January 23, 2018

Respectfully submitted,

/s/ Justin Florence
Justin Florence (MA Bar No. 667129)
Benjamin L. Berwick (MA Bar No. 679207)*
The Protect Democracy Project
10 Ware St.
Cambridge, MA 02138
(909) 326-2911
justin.florence@protectdemocracy.org

Jamila G. Benkato*
The Protect Democracy Project
2020 Pennsylvania Ave., NW #163
Washington, DC 20006
(202) 751-4058
jamila.benkato@protectdemocracy.org

Lindsay C. Harrison*
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com

*Pro Hac Vice motions forthcoming

Counsel for Plaintiffs