# United States Court of Appeals
## For the First Circuit

No. 19-1383

UNION OF CONCERNED SCIENTISTS and ELIZABETH ANNE SHEPPARD,

Plaintiffs, Appellants,

v.

ANDREW WHEELER, in his official capacity as Administrator of the
Environmental Protection Agency, and UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Zachary C. Schauf, with whom Lindsay C. Harrison, Samuel C.
Birnbaum, Julian J. Ginos, Jenner & Block LLP, Justin Florence,
Benjamin L. Berwick, Jamila G. Benkato, and The Protect Democracy
Project were on brief, for appellants.
Robert W. Ferguson, Attorney General of Washington, and Kelly
T. Wood, Assistant Attorney General, Washington State Attorney
General's Office, Counsel for Environmental Protection, were on
brief for amici curiae the states of Washington, California,
Connecticut, Illinois, Maryland, New Jersey, New York, Oregon,
Pennsylvania, the Commonwealth of Massachusetts, and the District
of Columbia.
Shaun A. Goho, Lynne I. Dzubow, and the Emmett Environmental
Law & Policy Clinic, Harvard Law School, were on brief for amici

curiae Lynn R. Goldman, Bernard Goldstein, David Michaels, Kenneth
Olden, Bob Perciasepe, and Terry Yosie.

Jeffrey E. Sandberg, Attorney, Appellate Staff, Civil
Division, U.S. Department of Justice, with whom Joseph H. Hunt,
Assistant Attorney General and Mark B. Stern, Attorney, Appellate
Staff, Civil Division were on brief, for appellees.

----

March 23, 2020

----

KAYATTA, **Circuit Judge**.   This case arises from a directive issued by the EPA that prohibits EPA grant recipients -- who are mostly employed by universities and other nonprofit institutions -- from sitting on the EPA's twenty-two scientific advisory committees.   A group of scientists affected by the directive complains that the directive violates the Federal Advisory Committee Act (FACA), Pub. Law 92-463, 86 Stat. 770 (1972) and the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq., Pub. L. 79-404, 60 Stat. 237 (1946).   After the district court dismissed the complaint for a lack of justiciability and failure to state a claim, the plaintiffs timely appealed the dismissal of Counts I, III, and IV.   Because the EPA's challenged directive is judicially reviewable under the APA, we reverse in part and remand for further proceedings.

## I.

At the time the complaint was filed, the EPA had twenty-two advisory committees, nine of which are established by statute. Those nine include the Clean Air Scientific Advisory Committee ("CASAC"), see 42 U.S.C. § 7409(d)(2)(A), and the Science Advisory Board ("SAB"), see 42 U.S.C. § 4365.   The other thirteen are created by presidential directive or by the EPA under its discretionary authority.   See 5 U.S.C. app. 2 § 3(2).   The general purpose of such advisory committees is to provide "expert advice,

ideas, and diverse opinions" to the agency. 5 U.S.C. app. 2 § 2(a).

Committee membership decisions are largely left to agency discretion, see 41 C.F.R. § 102-3.130(a), and agencies have considerable latitude to establish committees' "administrative guidelines and management controls," 5 U.S.C. app. 2 § 8(a). Some EPA committees are subject to more explicit statutory dictates as to their membership. For example, CASAC is required to have "at least one member of the National Academy of Sciences, one physician, and one person representing State air pollution control agencies." 42 U.S.C. § 7409(d)(2)(A). SAB's members "shall be qualified by education, training, and experience to evaluate scientific and technical information on matters referred to the Board." Id. § 4365. Advisory committee members are usually appointed for two- or three-year terms and are frequently reappointed.

The EPA's advisory committees have historically been subject to overlapping schemes of ethics checks. See Office of the Inspector General, U.S. EPA, Report No. 13-P-0387, EPA Can Better Document Resolution of Ethics and Partiality Concerns in Managing Clean Air Federal Advisory Committees, at 8-10 (Sept. 11, 2013) [hereinafter "OIG Report"], http://epa.gov/sites/production/files /2015-09/documents/20130911-13-p-0387.pdf. Generally, advisory-committee members, who are considered "special government

employees," see 18 U.S.C. § 202(a), are subject to regulations set
out by the U.S. Office of Government Ethics ("OGE"). The
regulations make clear that each committee member is:

> prohibited by criminal statute from
> participating personally and substantially in
> an official capacity in any particular matter
> in which, to his knowledge, he or any person
> whose interests are imputed to him under [the]
> statute has a financial interest, if the
> particular matter will have a direct and
> predictable effect on that interest.

5 C.F.R. § 2635.402(a) (citing 18 U.S.C. 208(a)); see also OIG
Report, supra, at 8. Some waivers are possible, and there are
exemptions. OIG Report, supra, at 8-9. For example, a committee
member "may participate in any particular matter of general
applicability where the disqualifying financial interest arises
from his non-Federal employment . . . provided that the matter
will not have a special or distinct effect on the employee or
employees other than as part of a class." 5 C.F.R. § 2640.203(g).
Agencies may add additional ethics rules with OGE's "concurrence."
Id. § 2635.105(a).

The EPA has additional conflict-of-interests rules of
its own, including internal policies for identifying potential
financial conflicts of interest. OIG Report, supra, at 9. Active
committee members must complete a conflicts form annually, which
requires them to supply information on paid work, assets, funding,
and other activities. Id. The forms are reviewed by an ethics

officer, and if potential problems are identified the member may be required to "take action to mitigate the concern." Id.[1]

The EPA administers several grant programs to fund scientific research, ultimately awarding over $4 billion in grants every year. EPA, EPA Grants Overview for Applicants and Recipients, https://www.epa.gov/grants/epa-grants-overview-applicants-and-recipients; see, e.g., 42 U.S.C. § 7403(b)(3) (Clean Air Act provision authorizing the EPA administrator to make grants); 33 U.S.C. § 1254(b)(3) (Clean Water Act provision authorizing the EPA administrator to make grants). Advisory committees do not participate in the EPA's grant-making decisions. Traditionally, EPA grant recipients have been permitted to serve on advisory committees while they are receiving EPA grants. The EPA's Inspector General explained in 2013 that "[t]he EPA does not consider a prospective or current member's receipt of an agency or other federal research grant to create the basis for a financial conflict of interest." OIG Report, supra, at 9.

---

[1] The OIG Report analyzed whether the EPA had properly managed potential conflicts of interest on CASAC and one other committee (the Advisory Council on Clean Air Compliance Analysis). OIG Report, supra, at 1. The report determined that the EPA had proper procedures for conflicts of interest but that they were not always clearly followed. Id. at 19 ("The SAB Staff Office has adequate procedures for identifying independence and impartiality concerns."). It recommended that the Science Advisory Board Staff Office, which "manages the CASAC and Council," id. at 5, develop better procedures for documenting investigations on conflicts of interest, id. at 14-17, 19-20.

- 6 -

So stood matters until October 2017, when the EPA's former director, E. Scott Pruitt, issued a directive called "Strengthening and Improving Membership on EPA Federal Advisory Committees." The directive sets out four principles. The principle labeled "Strengthen Member Independence" is the one to which the plaintiffs object. It reads as follows:

> Members shall be independent from EPA, which shall include a requirement that no member of an EPA federal advisory committee be currently in receipt of EPA grants, either as principal investigator or co-investigator, or in a position that otherwise would reap substantial direct benefit from an EPA grant. This principle shall not apply to state, tribal or local government agency recipients of EPA grants.

The directive is accompanied by a five-page explanatory memo, of which approximately half a page is dedicated to the objected-to principle. It states in pertinent part:

> A vital part of ensuring integrity and confidence in EPA's [advisory committees] comes from guaranteeing that [advisory committee] members remain independent of the Agency during their service. EPA [advisory committee] members should avoid financial entanglements with the EPA to the greatest extent possible.
>
> Non-governmental and non-tribal members in direct receipt of EPA grants while serving on an EPA [advisory committee] can create the appearance or reality of potential interference with their ability to independently and objectively serve as a[n advisory committee] member. [Advisory committee] members should be motivated by

service and committed to providing informed
and independent expertise and judgment.

The memo then otherwise largely repeats the language of the
principle on strengthening member independence.

The complaint alleges that the new directive
disqualifies "thousands of scientists affiliated with academic and
not-for-profit institutions." And precisely because those
scientists who receive EPA grants tend to be leaders in their
fields, the directive is said to target many of the most
knowledgeable scientists who are not affiliated with industry.
Some of the scientists have responded by surrendering grants in
order to continue serving their country. But, the plaintiffs
explain, many cannot make this sacrifice. As a result, the
plaintiffs allege that the directive has quickly and materially
increased the participation of industry-affiliated scientists on
EPA committees. On the SAB, for example, the number of industry-
affiliated scientists has tripled.

One of the scientists forced to step off an EPA grant in
order to remain a CASAC member was plaintiff Elizabeth Anne
Sheppard. Dr. Sheppard teaches environmental health science and
biostatistics at the University of Washington. Until the directive
issued, she served as co-lead investigator on a $3 million EPA
grant for researching health effects of air pollution. She and
the Union of Concerned Scientists, a nonprofit organization that

describes itself as representing the scientific community, commenced this suit in January 2018.  They seek both a declaration that the directive's bar on grant-recipient advisory committee members was unlawful and an injunction against it.  The complaint included four counts.  Count I of the complaint alleges that the directive violates the APA's reasoned decision-making standard, Count II alleges that the directive conflicts with directives issued by the General Services Administration and regulations of the Office of Governmental Ethics, and Counts III and IV allege violations of FACA's requirements for advisory committees.

The district court dismissed all the counts, finding that they raised questions unreviewable under the APA and, alternatively, that the first and second counts failed to state a claim on the merits.  Union of Concerned Scientists v. Wheeler, 377 F. Supp. 3d 34, 43-49 (D. Mass. 2017).  The plaintiffs now appeal the district court's dismissal of Counts I, III, and IV.

## II.

This court reviews a grant of a motion to dismiss, see Fed. R. Civ. P. 12(b)(6), de novo, assuming that all pleaded facts and reasonable inferences drawn from them are true, Breiding v. Eversource Energy, 939 F.3d 47, 49, 52 (1st Cir. 2019).  We also review de novo the question of whether a claim is justiciable under the APA.  See Massachusetts v. U.S. Nuclear Regulatory Comm'n, 708

F.3d 63, 73 (1st Cir. 2013) ("Errors of law are reviewed de novo.").

### A.

Congress enacted FACA in substantial part to "provide uniform standards for the creation, operation, and management of [advisory] committees."  S. Rep. No. 92-1098, at 1 (1972) (statement of purpose).  The Act followed on the heels of a disclosure that "the [Office of Management and Budget], without statutory authority, had established close liaison with an Advisory Council on Federal Reports (ACFR) composed entirely of business officials from each of the major industries" but not "consumer, labor, []or small business representatives." Id. at 2. The statute itself requires a committee's implementing legislation to "require the membership of [any] advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. app. 2 § 5(b)(2) ("fair balance provision").  It also requires that such legislation "contain appropriate provisions to assure that the [committee's] advice and recommendations . . . will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  Id. § 5(b)(3)

("inappropriate influence provision").[2]  Agency heads "shall" follow these guidelines in creating an advisory committee.  Id. § 5(c).  The EPA suggests that § 5(b) applies only to legislation, and thus provides no restraint on the agency's own selection of advisory committee members.  But § 5(c) extends those same requirements to "the President, agency heads, or other federal officials in creating an advisory committee" "[t]o the extent they are applicable."  FACA thus effectively reduces agencies' formerly absolute discretion over advisory committees for the "principal purpose" of "enhanc[ing] [their] public accountability."  Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 459 (1989).[3]  In accordance with that purpose, the statute uses the word "shall," which generally signals that compliance is mandatory.  5 U.S.C. app. 2 § 5(b)-(c); see Murphy v. Smith, 138 S. Ct. 784, 787 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty. . . ."); Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . .

---

[2] Deciding this appeal does not require that we consider how or whether one statute may dictate the terms of a subsequent statute.

[3] Legislative history suggests that Congress found these two provisions of FACA to be "[p]articularly important."  H.R. Rep. No. 92-1017, at 5 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 3495-96.  Congress was particularly concerned about the potential for "special interest groups [to] use their membership on such bodies to promote their private concerns."  Id.

normally creates an obligation impervious to judicial discretion.").

Each of the three counts that plaintiffs press on appeal describes the EPA's issuance of the Directive as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Collectively, they offer three reasons why this is so: the directive violates FACA's fair balance provision (Count III); the directive violates FACA's inappropriate influence provision (Count IV); and the EPA offered no rational explanation for adopting the directive, especially given that it changed prior policy (Count I). We address first Counts III and IV, the APA claims predicated on violations of FACA.

**1.**

FACA contains no private right of action. The APA, however, generally provides a vehicle for reviewing agency decisions that are alleged to violate federal law. See Cowels v. Fed. Bureau of Investigation, 936 F.3d 62, 66 (1st Cir. 2019) ("The [APA] waives federal sovereign immunity for suits alleging injury by agency action.") (citing 5 U.S.C. § 702). There is a "strong presumption" of judicial review under the APA. Mach Mining, LLC v. EEOC, 575 U.S. 480, 486 (2015); see also NAACP v. Sec'y of Housing & Urban Dev., 817 F.2d 149, 152 (1st Cir. 1987) ("[F]ederal action is nearly always reviewable for conformity with statutory obligations . . . .").

Notwithstanding that strong presumption, agency actions can evade judicial review under the APA if they are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).[4] Such a commitment exists when the agency action is of a kind "traditionally regarded as committed to agency discretion," Lincoln v. Vigil, 508 U.S. 182, 192 (1993), or when the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," id. at 191 (citing Heckler v. Chaney, 470 U.S. 821, 831 (1985)).

Two months after the district court issued its judgment in this case, the Supreme Court issued an opinion emphasizing that the § 701(a)(2) exception to the presumption of reviewability is "quite narrow[]." Dep't of Commerce v. New York, 139 S. Ct. 2551, 2568 (2019). In New York, the Court explained that the Census Bureau's decision to include a question about citizenship on the 2020 census was reviewable for its compliance with the Census Act. Id. at 2567–69. The Court explained that "the taking of the census is not one of those areas traditionally committed to agency discretion." Id. at 2568. As examples of such areas, the court pointed only to "decision[s] not to institute enforcement proceedings" and "a decision by an intelligence agency to terminate

---

[4] Review of an agency action is also unavailable where "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). Neither party argues that this exception applies here.

an employee in the interests of national security." Id. (citing Chaney, 470 U.S. at 831-82; Webster v. Doe, 486 U.S. 592, 600-01 (1988)); see also Weyerhauser Co. v. U.S. Fish and Wildlife Serv., 139 S. Ct. 361, 370 (2018) ("The few cases in which we have applied the § 701(a)(2) exception involved agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum allocation, or a decision not to reconsider a final action." (internal citations omitted)).

The Court also determined that the Census Act was not "drawn so that it furnishe[d] no meaningful standard" to apply. New York, 139 S. Ct. at 2568-69. Despite the fact that the Act "confer[red] broad authority on the Secretary," including "instruct[ing] him to take 'a decennial census of population' in 'such form and content as he may determine,'" it also set out standards to guide the content of the Census (including "the extent to which . . . statistical sampling" could be used and methods of collecting information). Id.

We apply the teaching of New York to the case before us. First, as to whether the make-up of agency advisory committees is an area traditionally left to agency discretion, the EPA has pointed us to nary a case that would suggest as much. It simply argues that advisory committee policies involve "the 'complicated balancing of a number of factors which are peculiarly within [the agency's] expertise,'" quoting Vigil, 508 U.S. at 191. But that

- 14 -

description applies to most things that the EPA does, including mandated non-discretionary activities.  Moreover, while agency discretion in handling advisory committees may have been unfettered prior to 1972, FACA itself was the result of Congress's determination that some fetters were needed.  Congress mandated that "[t]o the extent they are applicable, the guidelines set out in subsection (b) [of FACA] . . . shall be followed by . . . agency heads."  5 U.S.C. app. 2 § 5(c).  This is not the type of language Congress employs to create or preserve an area so traditionally left to agency discretion as to constitute an exception to the normal rule of justiciability.[5]

Second, as to whether FACA furnishes any meaningful standards that a reviewing court can apply, we train our attention on FACA'S fair balance and inappropriate influence standards.  The EPA claims that neither standard is "[j]udicially [m]anageable," because, according to the EPA, neither offers a "meaningful standard against which to judge the agency's exercise of discretion," quoting Chaney, 470 U.S. at 830.

We disagree with the EPA that courts are not well equipped to enforce at least the outer boundaries of ranges of

---

[5] To the extent the EPA is arguing that these are essentially hiring decisions committed to agency discretion, the argument fails.  These are clearly not individual hiring decisions committed to discretion, but an agency-wide policy addressed to special function committees.

this type.  *See, e.g.* New York, 139 S. Ct. at 2568-69 (relying on
the secretary's "duty to conduct a census that is accurate and
that *fairly* accounts for the crucial representational rights that
depend on the census and the apportionment" (emphasis added));
Weyerhauser, 139 S. Ct. at 371 (relying on law that "requires the
[s]ecretary to consider economic impact and relative benefits").
Nor does the fact that the statute leaves a great deal of
discretion to the agency, *see* 5 U.S.C. app. 2 § 8(a), make actions
taken pursuant to it unreviewable.  *See* Weyerhauser, 139 S. Ct. at
370 ("A court could never determine that an agency abused its
discretion if all matters committed to agency discretion were
unreviewable."); Chaney, 470 U.S. at 829-30 (clarifying that a
contrary approach would render APA review meaningless); Dugan v.
Ramsay, 727 F.2d 192, 195 (1st Cir. 1984) (explaining that the
"fact that an agency enjoys broad discretionary powers does not
mean judicial review is forbidden").  Here, for example, if the
agency announced that only persons paid by a regulated interested
business could serve on a committee, we would expect that FACA's
fair balance and inappropriate influence standards would supply a
meaningful tool for reviewing such a new policy.  *See* H.R. Rep. No.
92-1017, at 6 (1972), reprinted in 1972 U.S.C.C.A.N. 3491, 4596
(identifying "representatives of industry" as parties whose
"private interests" could be affected by the agency's work as
special interests).  To rule otherwise would be to conclude that FACA

failed to put an enforceable end to one of the very types of advisory relationships that prompted Congress to enact it in the first place.

There are certainly many different points of view that the EPA might take into account in forming its committees and different balances that can be struck in a committee's membership. Nevertheless, FACA clearly requires agency heads at least to consider whether new restraints on committee membership might inappropriately enhance special interest influence and to eschew such restraints when they do so. That requirement is at least as manageable as the requirements set out in the Census Act. See New York, 139 S. Ct. at 2568-69. The concepts of fairness, balance, and influence are not foreign to courts, and we are certainly capable of reviewing agency actions with reference to those concepts in at least some factual scenarios.

The EPA's position also ignores the important point that the APA provides for judicial review of both procedure and substance. See 5 U.S.C. § 706(2)(A) (prohibiting both actions that are "arbitrary" or "capricious" and actions "otherwise not in accordance with law"); Moss, 708 F.3d at 73 ("An agency's decision is not arbitrary and capricious if that decision was based on consideration of the relevant factors, and if the agency did not commit a clear error of judgment."); H.R. Rep. No. 1980, at 276 (1946) (explaining that in order to prevail under § 706 a complainant "must show that the action is contrary to law in either

substance or procedure" (emphasis added)); see also Bennett v.
Spear, 520 U.S. 154, 172 (1997) ("It is rudimentary administrative
law that discretion as to the substance of the ultimate decision
does not confer discretion to ignore the required procedures of
decision[-]making."). The EPA points out that the proper balance
of viewpoints will likely differ between committees simply by
virtue of the fact that the "functions to be performed" by each
committee, 5 U.S.C. app. 2 § 5(b)(2) -- which the agency is
instructed to consider in balancing committee membership -- are
different. But that is hardly a sufficient response to a
congressional command that each of the committees be fairly
balanced. Further, we see no reason why a court could not consider
the functions assigned to each individual committee in evaluating
whether its balance is fair.

Here, the EPA has admittedly changed a long-standing
practice. And it has done so in a manner that the complaint
plausibly describes as altering the balance and the role of special
interest influence on EPA advisory committees. Plaintiffs also
contend that the agency's justification for increasing the
relative role of special interests is itself irrational and refuted
by the agency's targeting of only EPA grant recipients who are not
affiliated with states, local governments, or tribes. In this
context, FACA's standards tell us what Congress intended the EPA
to consider, and the APA's reasoned decision-making standards tell

us how the EPA is to go about making and explaining that consideration.  As a result, sufficient standards exist for meaningful review of the decision-making process at issue here -- even if the standards themselves preserve wide agency discretion.

We acknowledge that there is some dispute among our sister circuits on this question of whether FACA's fair balance and inappropriate influence provisions are reviewable under the APA.  Our approach here accords with the majority view.[6]  And in any case, the contrary decisions were made before the Supreme

_____

[6] See Colo. Envtl. Coal. v. Wenker, 353 F.3d 1221, 1231-34 (10th Cir. 2004) (finding the fair membership balance requirement set out in FACA's implementing regulations justiciable, 43 C.F.R. § 1784.2-1(a) (roughly echoing FACA § 5(b)(2)), but that FACA's inappropriate influence provision did not provide a meaningful standard to apply); Cargill, Inc. v. United States, 173 F.3d 323, 334-41 (5th Cir. 1999) (finding that FACA's fair balance and inappropriate influence provisions were reviewable); Ala.-Tombigbee Rivers Coal. v. Dep't of Interior, 26 F.3d 1103, 1106-07 (11th Cir. 1994) (conducting review under FACA's fair balance provision, though not expressly addressing a challenge to its reviewability); Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods, 886 F.2d 419, 426, 432-34 (D.C. Cir. 1989) (Edwards, J., concurring) (finding the fair balance and inappropriate influence provisions reviewable); see also id. at 420-26 (Friedman, J., concurring) (reaching the merits as to whether the challenged action violated FACA).  But see Ctr. for Policy Analysis on Trade and Health v. U.S. Trade Rep., 540 F.3d 940, 943-45 (9th Cir. 2008) (finding FACA's fair balance requirement not reviewable in the particular scenario complained of because it provided "no meaningful standards to apply" nor "articulate[d] what perspectives must be considered"); Pub. Citizen, 886 F.2d at 426, 430-31 (Silberman, J., concurring) (finding the fair balance and inappropriate influence requirements not reviewable because there was no "meaningful standard . . . susceptible of judicial application").

Court's decision in <u>New York</u>, which, as we have described above, provides more clarity on this issue.

In sum, FACA requires the EPA to maintain a fair balance on its committees and to avoid inappropriate influences by both the appointing authority and any special interest. Plaintiffs allege that the directive skewed the composition of EPA committees in favor of regulated industries. They further allege that the EPA offered no rational reason for finding that any benefits of the policy justified the alteration of balance and influence on the committees. Indeed, the allegation is that the EPA did not even acknowledge that the directive had such an effect. These allegations plausibly state claims for judicial review under the APA. So we remand this case to the district court for further proceedings on Counts III and IV.[7]

**2.**

Unlike Counts III and IV, Count I alleges violations of only the APA itself. It specifically relies on 5 U.S.C. § 706(2)(A), which prohibits agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." We have previously explained that

> An agency decision fails to pass this test if
> the administrative record reveals that "the

---

[7] We anticipate that further proceedings on Counts III and IV will include the compiling and certification of the administrative record, customarily "[t]he focal point of APA review." <u>Atieh</u> v. <u>Riordan</u>, 727 F.3d 73, 76 (1st Cir. 2013).

> agency relied on improper factors, failed to
> consider pertinent aspects of the problem,
> offered a rationale contradicting the evidence
> before it, or reached a conclusion so
> implausible that it cannot be attributed to a
> difference of opinion or the application of
> agency expertise."

Atieh v. Riordan, 727 F.3d 73, 75-76 (1st Cir. 2013) (quoting

Assoc'd Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st

Cir. 1997)); see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.

State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Claims

under § 706(2)(A) are subject to the same limits on reviewability

set forth at § 701(a), see Chaney, 470 U.S. at 828, and the EPA

argues that Count I is not reviewable for largely the same reasons

as Counts III and IV.

     The principal difference between Count I and Counts III

and IV is that Count I alleges a violation of the reasoned

decision-making standards of the APA alone.  The EPA thus argues

that § 706(2)(A) does not itself provide the "meaningful standard"

required for review under Chaney, 470 U.S. at 830.  See Lunney v.

United States, 319 F.3d 550, 559 n.5 (2d Cir. 2003) ("We . . .

note that the APA's 'arbitrary and capricious' standard, see 5

U.S.C. § 706(2)(A), cannot be sufficient by itself to provide the

requisite 'meaningful standard' for courts to apply in evaluating

the legality of agency action.  See Chaney, 470 U.S. at 829-30.

If agency actions could be challenged as 'arbitrary and

capricious,' without reference to any other standard, then

§ 701(a)(2)'s limitation on APA review would amount to no limitation at all . . . ." (emphasis in original)).

The plaintiffs counter that they can rely wholly on § 706(2)(A) to provide a standard for review, citing <u>Robbins</u> v. <u>Reagan</u>, 780 F.2d 37 (D.C. Cir. 1985). Even <u>Robbins</u>, however, relied on external standards:

> While the absence of clear statutory guidelines might at times hamper a court's ability to deem agency action contrary to law, it need not always do so. Even where there are no clear statutory guidelines, courts often are still able to discern from the statutory scheme a congressional intention to pursue a general goal.

<u>Id.</u> at 45.

We are unable to locate any case in which we have decided a claim under § 706(A)(2) without the benefit of an additional set of statutory or regulatory requirements to guide us in assessing the propriety of an agency's procedures in a matter. While we have not clearly defined the outer limits of the types of "law" that may furnish meaningful standards for deciding claims under § 706(2)(A), <u>see</u> <u>Cowels</u>, 936 F.3d at 66–67 (declining to decide whether the FBI's National DNA Index System Manual was sufficient to provide law to apply), statutes constraining or guiding the relevant agency's discretion surely qualify if they create "judicially manageable standards," as required by § 701(a)(2), <u>Chaney</u>, 470 U.S. at 830; <u>see, e.g.</u> <u>City of Taunton</u> v. <u>EPA</u>, 895

F.3d 120, 124-29 (1st Cir. 2018), <u>cert. denied</u>, 139 S. Ct. 1240 (2019) (relying on the Clean Water Act to guide a claim under § 706(A)(2)).

Whether a court could entertain a so-called "pure APA" action without reference to another substantive statute is a question we need not and do not decide.  The thrust of plaintiffs' claim is that the challenged EPA action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law precisely because the EPA failed to rationally consider and explain the effects of the directive under FACA's standards.  The plaintiffs do cite as background other statutes and regulations erecting committees and setting out a baseline ethics regime, including 18 U.S.C. § 208 and OGE's regulations, described above. But they make no claim that this background plays any role distinct from the role it plays under Counts III and IV.  That is, these statutes and regulations may certainly provide context for the agency's actions as they are evaluated under Counts III and IV, but nothing in the complaint points to any noncompliance with them.

Ultimately, the outcome of this litigation will turn on the resolution of APA review under Counts III and IV, which incorporate the plaintiffs' complaints about the EPA's decision-making process.  That is, Counts III and IV <u>are</u> APA claims and plaintiffs point us to no fact or theory that could be considered under Count I but not Counts III and IV.  <u>Cf</u>. <u>Cousins</u> v. <u>Sec'y of</u>

the U.S. Dep't of Transp., 880 F.2d 603, 605–07 (1st Cir. 1989)
(en banc) (explaining that the plaintiff's claim based on a federal
Department of Transportation rule was more properly conceived as
an APA challenge, and did not justify an analysis of whether a
private right of action should be implied under the Rehabilitation
Act, given that "[t]he APA was intended to provide . . . a single
uniform method for review of federal agency action").  In the end,
plaintiffs made clear in their reply and at oral argument that
Count I should be read as relying on FACA, at least unless we find
FACA insufficient to provide a justiciable standard.  And since we
agree with plaintiffs that FACA does provide justiciable
standards, we will treat Count I as subsumed in Counts III and IV.
As a result we affirm the district court's dismissal of Count I as
a free-standing claim and direct the District Court to apply the
standards set forth in § 706(2)(A) to its analysis of Counts III
and IV.

## B.

The EPA also argues that the plaintiffs' claims are not
ripe because the plaintiffs have not shown that the directive has
actually excluded scientists affiliated with academic and non-
profit institutions in a way that has caused or will cause
imbalance on the committees.  The EPA acknowledged at oral
argument, however, that after the directive went into effect,
committee members including plaintiff Sheppard had to choose

between their EPA grants and committee memberships immediately, and some individuals left their committees for that reason. That is to say, "[r]esolution of the actual claim[s] here . . . hinges on an assessment of events that have already occurred." <u>Town of Barnstable</u> v. <u>O'Connor</u>, 786 F.3d 130, 143 (1st Cir. 2015).

The EPA seems also to make a mootness argument along the lines that, now that Sheppard's term of service on the CASAC has ended, she no longer faces the choice created by the directive. But the plaintiffs have argued that historically committee members have served multiple terms of service. And in any case, the plaintiffs seek declaratory judgment. If they are successful and the EPA is forced to abandon the directive, grant recipients will again be permitted to sit on the EPA's committees. So long as there is some "concrete interest, however small, in the outcome . . ., the case is not moot." <u>Id.</u> at 142 (quoting <u>Knox</u> v. <u>Serv. Emps. Int'l Union, Local 1000</u>, 567 U.S. 298, 307–08 (2012)). To the extent the EPA makes a mootness argument, it too fails.

### III.

For the foregoing reasons, we <u>reverse</u> the district court's decision on Counts III and IV, and <u>remand</u> for further proceedings consistent with our decision, which should include the dismissal of Count I without prejudice to further proceedings on Counts III and IV.